**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PRECISION DRYWALL, INC., individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>UNITED STATES GYPSUM COMPANY, USG CORPORATION, NEW NGC, INC., LAFARGE NORTH AMERICA, INC., CERTAINTEED CORP., GEORGIA-PACIFIC LLC, AMERICAN GYPSUM COMPANY LLC, TIN INC. d/b/a TEMPLE-INLAND INC., PABCO BUILDING PRODUCTS, LLC,<br>     Defendants. | Case No.:_____<br><br>Judge:<br><br>COMPLAINT<br><br>CLASS ACTION |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Precision Drywall, Inc., ("Plaintiff" or "Precision Drywall"), by and through its attorneys WILLIAMS MONTGOMERY & JOHN, LTD., brings this action for treble damages under the antitrust laws of the United States against United States Gypsum Company, USG Corporation, New NCG, Inc., LaFarge North America, Inc., CertainTeed Corp., Georgia-Pacific LLC, American Gypsum Company LLC, TIN Inc. d/b/a Temple-Inland Inc., and PABCO Building Products, LLC ("Defendants"), and demands a jury trial. The allegations herein are based upon the investigation of counsel, the personal knowledge of Plaintiff, economic analyses of the relevant industry, and other information and belief.

1

## TABLE OF CONTENTS

I.  OVERVIEW OF THE ALLEGATIONS..................................................................4

II.  JURISDICTION AND VENUE .....................................................................11

III.  INTERSTATE TRADE AND COMMERCE ..................................................12

IV.  PARTIES ...................................................................................................12

V.  CLASS ALLEGATIONS .............................................................................15

VI.  FACTUAL ALLEGATIONS .......................................................................17

    A.  Gypsum Board .................................................................................17

    B.  Gypsum Finishing Products.............................................................19

    C.  The Gypsum Industry .......................................................................21

    D.  The Gypsum Industry's Market Characteristics Are Conducive To Collusion.........21

        1.  Sales Of Gypsum Board In The United States Are Conducive To Collusion Because They Are Controlled By Only A Limited Number Of Producers...................................................................................21

        2.  High Barriers To Entry In The Gypsum Board Market Make The Industry Susceptible To Collusion ............................................................22

        3.  Price Inelasticity For Gypsum Board Makes The Industry Susceptible To Collusion ..............................................................................24

        4.  Defendants Had Many Opportunities To Collude ........................................25

        5.  The Gypsum Board Industry Has A History Of Collusive Behavior ............26

    E.  The Conspiracy .................................................................................27

        1.  Defendants' Price Increase On Gypsum Board ............................................28

            a.  The Early Stages Of The Conspiracy...................................................28

            b.  Defendant's Coordinated 2012 Price Increase On Gypsum Board............................................................................................30

            c.  Defendants' Coordinated 2013 Price Increase On Gypsum Board............................................................................................33

d.      Defendants' Forthcoming 2013 Price Increases On Gypsum Board.................................................................................35

e.      Defendants' Coordinated Elimination of Job Quotes ........................36

f.      Defendants' Concerted Supply Restrictions ....................................38

2.      Defendants' Conspiratorial Price Increase On Gypsum Finishing Products.........................................................................................40

a.      Defendant's Coordinated 2012 Price Increase On Gypsum Finishing Products ...........................................................40

b.      Defendants' Coordinated 2013 Price Increase On Gypsum Finishing Products ...........................................................41

c.      Defendants' Forthcoming 2013 Price Increases On Gypsum Finishing Products ...........................................................42

F.      Industry Patterns Support The Existence Of A Conspiracy .....................................42

1.      A Comparative Analysis Of Crude Gypsum Prices To Defendant Pricing Patterns And Decreased Demand For Gypsum Board Evidences Conspiratorial Conduct ................................................................42

2.      Price Increases Closely Followed Industry Meetings....................................45

3.      Defendants' Stated Reasons For Price Increases Were False........................46

VII.      VIOLATIONS OF THE ANTITRUST LAWS....................................................46

VIII.      ANTI-COMPETITIVE EFFECTS .....................................................................47

IX.      CAUSE OF ACTION – VIOLATIONS OF SHERMAN ACT §1 .......................48

X.      DEMAND FOR JURY TRIAL .........................................................................49

XI.      PRAYER FOR RELIEF ....................................................................................49

## OVERVIEW OF THE ALLEGATIONS

1.      Plaintiff alleges that Defendants, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, engaged in two overlapping and interlaced conspiracies.  First, Plaintiff alleges that Defendants conspired, combined, or contracted to restrict output and to fix, raise, maintain, or stabilize the price of "Gypsum Board" that they sold to Plaintiff and the other members of the Class from at least March 2008 through the present.  Second, Plaintiff alleges that, beginning in at least early 2012, Defendants engaged in a conspiracy to fix, raise, maintain, or stabilize the price of "Gypsum Finishing Products."

2.      Both alleged conspiracies are ongoing: Defendants have already issued synchronized price increase announcement letters for Gypsum Board and Gypsum Finishing Products in 2013, and plan to announce at least two additional price increases in 2013.

3.      "Gypsum Board" – also known as drywall, wallboard, sheetrock, or plasterboard – is used in over 90% of all new residential and commercial construction projects in the United States. On average, a new home built in the United States contains more than 7.31 metric tons of gypsum. Due to its sound-dampening, fire-retarding and moisture-control qualities, Gypsum Board has no reasonably functional substitute.  Accordingly, manufacturers of Gypsum Board are able to increase market prices without fear that purchasers might turn to an alternate product for their drywall needs.

4.      "Gypsum Finishing Products" are products used in the installation of drywall. These products include joint tapes, glues, joint compounds or drywall mud, setting compounds, and textured products. After the drywall is hung, it must be finished with a combination of the above mentioned materials. Gypsum Finishing Products have been specially designed for the installation phase, and there are no reasonable substitutes for these products if drywall is to be

4

installed and used as intended. Accordingly, manufacturers of Gypsum Finishing Products are able to increase market prices without fear that purchasers might turn to an alternate product for their finishing needs.

5.      As a result of the Defendants' unlawful conduct alleged herein, Plaintiff and other members of the Class paid supra-competitive prices for Gypsum Board and Gypsum Finishing Products, and thus suffered injury of the type the federal antitrust laws are designed to prevent. For example, Precision Drywall, an Illinois corporation located in Huntley, Illinois, directly purchases approximately $200,000-300,000 of Gypsum Board annually from one or more Defendants, and significant additional amounts of Gypsum Finishing Products. Thus, the conduct alleged herein has damaged Plaintiff to a very significant degree, causing an estimated $450,000 or more of economic loss.  Plaintiff seeks to recover these substantial losses.

### Overview of The Conspiracy to Increase The Price of Gypsum Board

6.      Substantial economic evidence indicates that, given historical supply and demand indicators in the gypsum industry, prices for Gypsum Board have, since at least 2008, been inexplicably higher than they would have been absent a conspiracy.

7.      Economic evidence demonstrates that, on many occasions, prices of Gypsum Board rose by substantial amounts (not explained by market forces) immediately following industry association meetings attended by representatives of Defendants. This strongly suggests that pricing agreements were reached at these industry meetings. *See Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 896-897 (N.D. Ill. 2009).

8.      Economic evidence demonstrates that the reasons Defendants provided to Plaintiff as justification for their price increases – increased raw material costs and increased

"expenditure on research and development to introduce innovative new products" – were in fact false and did not justify price increases of the magnitude involved.

9.      From at least March 2008 through the present, Defendants combined and conspired to fix and raise the prices at which they sold Gypsum Board in the United States.

10.     Starting in early 2008, Defendants initiated a series of coordinated price increases not justified by economic conditions. Historically, Gypsum Board prices closely followed total construction spending. That is, during the housing boom both Gypsum Board prices and total construction spending rose, and likewise Gypsum Board prices and total construction spending fell together during the housing crash. However, following the largest housing crash in U.S. history in late 2007, construction spending fell and the price of Gypsum Board did not – in fact, the price of Gypsum Board rose. This anomaly was the result of a conspiracy.

11.     Then in September and October of 2011, Defendants announced the largest coordinated price increase in more than a decade. All Defendants advised that this price increase would become effective on the same day (on or about January 1, 2012).

12.     Just prior to the unprecedented price increase announcement, on September 13-16, 2011, certain Defendants attended the annual Association of the Wall & Ceiling Industry Executives' Conference & Committee Meeting in Coeur d'Alene, Idaho. Shortly thereafter, Defendants met on October 17-18, 2011, at the Global Gypsum Conference in Las Vegas, Nevada.

13.     At that Las Vegas trade meeting, Mr. Bob Bruce, owner of Innogyps, Inc., the leading gypsum market consulting entity in North America, acknowledged that the industry faced continued difficult economic conditions, and explicitly warned that economic conditions did not support a price increase. Mr. Bruce stated: "The industry needs to achieve in the region

6

of 85% capacity utilization to be able to push through prices rises, rather than the 55% level that we are at right now."

14.     Despite these well-known industry economics, which did not support a price increase, between late September and mid-October 2011, five of the eight Defendant manufacturers announced that they would be raising the price of Gypsum Board in January 2012 by an unprecedented 35%, and indicated that the price increase would remain in place for the entire 2012 calendar year. The remaining Defendants similarly issued price increase announcement letters or otherwise informed purchasers that they would be imposing a substantial price increase, that the increase would become effective on the same date, and that the price increase would have the same duration. These price increase announcement letters issued by Defendants were almost identical in nature; *see, e.g.,* ¶112 below.

15.     The 2012 price increase on Gypsum Board was led by Defendant American Gypsum.  This is economically suspect given their small market share relative to industry leaders like Defendants USG and New NGC. Such pricing action by a relatively minor player would have been contrary to American Gypsum's self-interest absent assurances and agreement that the competition would follow suit.  Moreover, because Gypsum Board is a commodity product it would have been illogical, absent collusion, for Defendants to unilaterally issue a price increase of this magnitude.

16.     As set forth below, the price increases alleged herein were not justified by increased cost of the primary input product in Gypsum Board – crude gypsum; s*ee Figure 3 below*.

17.     Nor were they justified by demand; s*ee Figure 4 below*.

18.     Defendants successfully maintained the resultant price (up 35%) for the entirety of the 2012 calendar year.  These increases were imposed despite a soft construction market; *see* ¶114 below. Defendants also maintained these elevated prices in the face of significant industry overcapacity.  Absent collusion, such overcapacity would have made it virtually impossible for any Defendant to independently impose and maintain a price increase of this degree.

19.     Not only have Defendants maintained their initial price increase, they recently announced another substantial price increase that became effective on January 1, 2013.  Once again, Defendants' price increase announcement letters closely emulated one another's in verbiage and effect; *see* ¶121 below.

20.     Based upon the investigation of counsel, including interviews with individuals knowledgeable about the industry, Defendants have already discussed future price increases on Gypsum Board, and expect to announce at least two additional price increases in 2013.

21.     In conjunction with the January 2, 2012 price increase, each of the Defendants also abruptly abolished the use of a decades-old competitive pricing practice known as job quotes.  This practice was used throughout the Gypsum Board industry and was a key component of each Defendant's business model.  Job quotes permitted purchasers to lock-in the price of Gypsum Board for the duration of a construction project.  Notwithstanding the essential role this pricing model had historically played in the industry for more than four decades, Defendants discontinued this practice in late 2011, concurrently with the industry-wide price increase described above.

22.     Job quotes protected purchasers of Gypsum Board from price increases occurring in the middle of a project by allowing purchasers to lock-in the price of Gypsum Board (sometimes with specified price increase allowances) at the beginning of a project.  Equally

important is the fact that job quotes acted as a mechanism for competitive pricing amongst manufacturers. The coordinated industry change of no longer offering job quotes or price protection effectively shifted the risk of future price increases squarely to purchasers and was deliberately orchestrated to grow Defendants' profit margins at the expense of purchasers. A research analyst who follows the industry commented: "the elimination of job quotes paves the way for a meaningful price increase. That, in a nutshell, is the story."

23. The elimination of competitive job quotes facilitated collusion because it made pricing more consistent throughout the industry, and allowed Defendants to more easily monitor and detect any failure to conform to the conspiracy. Prior to the elimination of job quotes, as much as 70% of all Gypsum Board was sold pursuant to a job quote. If job quotes had remained in place, a Defendant's failure to implement a price increase would not necessarily imply defection from the conspiracy, but could simply be pricing consistent with the job quote practice. However, with the discontinuation of job quotes, any failure to impose the price increase on purchasers would be more readily recognized by co-conspirators. Thus, by collusively eliminating the job quotes practice, Defendants not only ensured more immediate and consistent implementation of their conspiratorial 2012 price increase, but also facilitated the monitoring of the conspiracy.

24. Since these changes were implemented on January 1, 2012, none of the Defendants have sought to eliminate the price increase or reinstitute the job quotes practice to gain market share. Departing from prior practice, Defendants implemented their announced price increase with limited negotiation. Whereas purchasers had, in the past, been able to leverage bids obtained from multiple manufacturers, Defendants now limited such competitive activity.

25.     Defendants also implemented supply restrictions to facilitate the conspiracy's reach in imposing and maintaining the industry-wide price increase. These supply restrictions were initiated notwithstanding substantial overcapacity in the industry. (In fact, the industry was barely operating at just over 50% its actual capacity.) In the absence of a conspiracy, it would have been contrary to the individual interests of any Defendant to restrict the supply of Gypsum Board because purchasers would have simply turned to competing suppliers to meet their needs. However, with the conspiracy in place, purchasers had no better option. Similarly, due to limited demand for Gypsum Board and substantial overcapacity, no manufacturer could have unilaterally imposed and maintained the large price increase or eliminated the longstanding competitive pricing practices of providing job quotes. Had they tried to do so, purchasers would have shifted their business to other suppliers. But again, with the conspiracy in place purchasers had no better option.

***Overview of The Conspiracy to Increase The Price of Gypsum Finishing Products***

26.     Beginning in at least early 2012, Defendants combined and conspired to fix and raise the price of Gypsum Finishing Products as well.

27.     Not but a few months after they coordinated to increase the price of Gypsum Board, Defendants announced and implemented a similar price increase on Gypsum Finishing Products.

28.     To announce their collusive price increase on Gypsum Finishing Products, Defendants issued price increase announcement letters that were again remarkably similar; *see* ¶140 below.

29.     Following the price increase patterns on Gypsum Board, Defendants just recently announced a second, sizable increase on Gypsum Finishing Products for 2013.   These price increase announcement letters were once again alike in verbiage and effect; *see* ¶145 below.

30.     Defendants have already discussed and intend to implement at least two further price increases on Gypsum Finishing Products during 2013.

31.     As a result of Defendants' collusion, Plaintiff and all other direct purchasers of Gypsum Board and Gypsum Finishing Products have paid artificially inflated prices.  This action is brought by Plaintiff and the proposed Class to secure the relief afforded by the Sherman Act against Defendants' unlawful conspiracies.

## JURISDICTION AND VENUE

32.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Plaintiff and the other members of the Class have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

33.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

34.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

35.     This Court has personal jurisdiction over each Defendant, because each Defendant – throughout the United States and including in the Northern District of Illinois – transacted business, sold Gypsum Board and Gypsum Finishing Products, maintained substantial

contacts, and/or committed overt acts in furtherance of their illegal scheme and price-fixing conspiracy. The conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in the Northern District of Illinois. In addition, Defendant United States Gypsum is headquartered in Chicago, Illinois, which is located in this District.

## INTERSTATE TRADE AND COMMERCE

36.     The activities of Defendants, as described in this Complaint, were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States, this District included.

37.     During the Class Period, Defendants manufactured, sold and shipped Gypsum Board in a continuous and uninterrupted flow of interstate commerce. The price-fixing conspiracy in which the Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## PARTIES

38.     Plaintiff Precision Drywall is a corporation with its principal place of business in the state of Illinois. Plaintiff purchased Gypsum Board and Gypsum Finishing Products directly from one or more of the Defendants during the Class Period.

39.     Defendant USG Corporation (referred to collectively with United States Gypsum Company as "USG") is a public corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, Illinois. USG Corporation, through its wholly-owned subsidiaries United States Gypsum Company, L&W Supply Corporation, and Roselle Building Specialties, is a leading manufacturer and distributor of Gypsum Board and Gypsum Finishing Products. Defendant United States Gypsum Company is

a wholly-owned subsidiary of USG Corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, Illinois. During the Class Period, USG manufactured and sold Gypsum Board and Gypsum Finishing Products to purchasers in the United States, including to members of the Class. USG has had the largest market share of any of the manufacturers prior to and during the Class Period. Specifically, in 2011 USG had approximately 25% of the U.S. sales of Gypsum Board.

40. Defendant New NGC, Inc. ("National Gypsum"), commonly known as National Gypsum Company, is a privately-held corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Charlotte, North Carolina. During the Class Period, National Gypsum manufactured and sold Gypsum Board and Gypsum Finishing Products to purchasers in the United States, including to members of the Class. In 2011, National Gypsum had approximately 23% of sales of Gypsum Board in the United States.

41. Defendant LaFarge North America Inc. ("LaFarge") is a corporation organized, existing, and doing business under the laws of the State of Maryland, with its headquarters in Reston, Virginia. During the Class Period, LaFarge manufactured and sold Gypsum Board and Gypsum Finishing Products to purchasers in the United States, including to members of the Class. In 2011, LaFarge had approximately 8% of sales of Gypsum Board in the United States.

42. Defendant CertainTeed Corporation ("CertainTeed") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Valley Forge, Pennsylvania. During the Class Period, CertainTeed manufactured and sold Gypsum Board and Gypsum Finishing Products to purchasers in the United States, including to members of the Class. In 2011, CertainTeed had approximately 13% of sales of Gypsum Board in the United States.

13

43.     Defendant Georgia-Pacific LLC ("Georgia-Pacific") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Atlanta, Georgia.   During the Class Period, Georgia-Pacific manufactured and sold Gypsum Board and Gypsum Finishing Products to purchasers in the United States, including to members of the Class.  In 2011, Georgia-Pacific had approximately 10% of the sales of Gypsum Board in the United States.

44.     Defendant American Gypsum Company LLC ("American Gypsum") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Dallas, Texas.  During the Class Period, American Gypsum manufactured and sold Gypsum Board and Gypsum Finishing Products to purchasers in the United States, including to members of the Class.  In 2011, American Gypsum had approximately 10% of sales of Gypsum Board in the United States.

45.     Defendant TIN Inc. d/b/a Temple-Inland Inc. ("Temple-Inland") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Austin, Texas.  During the Class Period, Temple-Inland manufactured and sold Gypsum Board and Gypsum Finishing Products to purchasers in the United States, including to members of the Class.  In 2011, Temple-Inland had approximately 7% of sales of Gypsum Board in the United States.

46.     Defendant PABCO Building Products, LLC ("Pabco") is a corporation organized, existing, and doing business under the laws of the State of California, with its headquarters in Rancho Cordova, California.  During the Class Period, Pabco manufactured and sold Gypsum Board and Gypsum Finishing Products to purchasers in the United States, including to members

14

of the Class. In 2011, Pabco had approximately 4% of sales of Gypsum Board in the United States.

47. The acts taken by Defendants, as alleged herein, were authorized, ordered and condoned by their respective parent companies and authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

48. Various other persons, corporations, or firms not named as Defendants herein have participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

## CLASS ACTION ALLEGATIONS

49. Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of class of plaintiffs (the "Class") consisting of:

> All persons or entities that purchased Gypsum Board or Gypsum Finishing Products in the United States directly from any of the Defendants, their subsidiaries, affiliates or joint-ventures from January 1, 2012 through the present (the "Class Period"). Excluded from the Class are Defendants their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

50. The Class is so numerous that joinder of all members is impracticable. On information and belief, hundreds, if not thousands of individuals and entities purchased Gypsum Board and Gypsum Finishing Products from the Defendants during the Class Period.

51. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all Class members share the same injury, as they were all damaged by the actions of

Defendants, which caused them to pay artificially inflated prices for Gypsum Board and Gypsum Finishing Products.

52.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class members.

53.     Plaintiff is represented by counsel who are experienced and respected in the prosecution of class actions, the litigation and trial of antitrust actions, and litigation in the Northern District of Illinois and various other federal jurisdictions. In addition, Plaintiff's counsel is widely reputed for its trial experience.

54.     This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class, such as:

- Whether Defendants engaged in a conspiracy to raise, fix, and maintain prices of Gypsum Board or Gypsum Finishing Products sold in the United States;

- Whether Defendants conspired to eliminate the practice of providing job quotes;

- The duration and extent of the conspiracy;

- Whether each Defendant was a participant in any such conspiracy;

- Whether the actions of Defendants in so conspiring violated Section 1 of the Sherman Act;

- Whether the conspiracy had the effect of artificially inflating the price of Gypsum Board and Gypsum Finishing Products sold in the United States during the Class Period;

- Whether the conduct of Defendants caused injury to Class members; and

- The measure and amount of damages incurred by the Class.

55.     Adjudicating the claims of the Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

## FACTUAL ALLEGATIONS

### A.     Gypsum Board

56.     Gypsum Board consists primarily of a solid, flat core of gypsum rock sandwiched between two sheets of linerboard paper. It is commonly called drywall, sheetrock, wallboard or plasterboard. To be considered gypsum board, the core must be predominately gypsum.

57.     Gypsum is one of the most widely used minerals in the world. Although there are two types of gypsum – natural and synthetic – they are chemically identical ($CaSO_4\ 2H_2O$).

58.     Natural gypsum is a mineral mined in seventeen states. Iowa has long been among the leading states in crude gypsum-production. In fact, the Midwest has a long history with Gypsum Board. Drywall was patented by a resident in Fort Dodge, Iowa. Today, Defendants National Gypsum Company, Georgia Pacific Corporation, and United States Gypsum Company operate gypsum facilities in and around Fort Dodge, Iowa. Gypsum Board was also first used in high-rise construction for the John Hancock Center and Sears (now, Willis) Tower, both located in Chicago.

59.     Gypsum is extracted through mining or quarrying veins of ore that are found close to the earth's surface.  Gypsum deposits lie in flat beds of about six to eight feet in thickness, and are often inter-layered with limestone or shale.

60.     One hundred pounds of gypsum contains approximately twenty-one pounds of chemically combined water.  To drive off the majority of this water and turn the raw product into usable gypsum, it is first crushed into a powder and heated to 350 degrees Fahrenheit.  This process is called "calcining."

61.     The powder is made into Gypsum Board by mixing it with water and other additives and feeding this slurry between layers of paper on a board machine.  The paper edges of the board are machine-wrapped as the face and back paper become chemically and mechanically bonded to the gypsum core.

62.     The calcium sulfate then recrystallizes, and the board is cut to length and conveyed through dryers to remove any of the remaining moisture.  After the board is dried it is inspected and trimmed again. Individual boards are bound together in pairs in a two-sheet stack called a "book."

63.     Approximately 90% of gypsum mined in the United States is used to produce Gypsum Board. Of the Gypsum Board used in construction, half is used in new residential construction. *See Figure 1.*  Gypsum Board is used in more than 97% of the new homes constructed in the United States and Canada, and an average new American home contains more than 7.31 metric tons of gypsum or, in other terms, more than 6,144 square feet (571 square meters) of gypsum wallboard.



*Figure 1.*

64.     Gypsum Board is sold in standardized widths, lengths and thicknesses.  One-half inch, 5/8 inch and 5/16 inch are the most common thicknesses, and 12 feet by 4 feet is the most commonly produced size.

65.     Gypsum Board differs from products like plywood, hardboard and fiberboard because of the non-combustible core, primarily comprised of fire-resistant gypsum.

### B.     Gypsum Finishing Products

66.     Gypsum Finishing Products are products used in the installation of drywall. These products include joint tapes, glues, joint compounds or drywall mud, setting compounds, and textured products.  After the drywall is hung, it must be finished with a combination of the materials described below.

67.     Finishing is the drywall process that begins once the drywall is hung (includes taping, coating, and texturing).  Once the drywall is hung, the seams between drywall sheets must be concealed using joint tape and several layers of joint compound.

68.     Taping is the process of applying tape to each joint.  A joint is the seam at which two pieces of gypsum board meet.  Joint tape is the paper or mesh material used to seal the joints between sheets of drywall.  Joint tape is applied to the joints with joint compound.

69.     Joint compound is a white substance similar to plaster used to seal joints between sheets of Gypsum Board, primarily in building construction.  It is often referred to simply as mud.  The compound is a complex combination often including water, limestone, expanded perlite, ethylene-vinyl acetate polymer, attapulgite, and other ingredients.

70.     Joint compound is most commonly used in hanging drywall for new or remodeled homes.  When used for new walls, joint compound effectively eliminates all blemishes from the surface of the drywall, such as drilled in screws, fasteners, hanging tape, or drywall tape.

71.     Joint compound can be used to finish gypsum panel joints, corner bead, trim and fasteners, as well as skim coating.  In North America the application of joint mud and drywall tape sealer and trowelled joint compound on gypsum panels is a standard construction technique for painted wall and ceiling surfaces.

72.     Setting compounds are powder compounds designed for same day drywall finishing.  Setting compounds provide a hard, plaster-like surface when dry and are virtually unaffected by humidity.

73.     Setting compounds provide multiple applications: filling, smoothing, and finishing interior concrete ceilings and above-grade concrete surfaces; taping and finishing gypsum panels; and taping and finishing tile backerboard under tiles in bathroom wall areas.  Other uses include finishing joints in exterior gypsum ceiling boards and presetting veneer plaster finish system joints.  They are ideal for heavy fills.

74.     Setting compounds provide low shrinkage and superior bond, which make them excellent for laminating gypsum panels to gypsum panels, sound-deadening boards, and above-grade concrete surfaces.

75.     Texturing is the process of applying a decorative finish to the drywall.  Textured products provide a decorative treatment of Gypsum Board surfaces.

76.     Gypsum Finishing Products are necessary for the proper installation of Gypsum Board. Use of the above mentioned materials is considered "standard construction technique" when working with Gypsum Board.  Without these finishing materials, Gypsum Board does not function as intended for use in building construction.

C.       **The Gypsum Industry**

77.     The major manufacturers of Gypsum Board have annual fill-capacity sales of more than $10 billion dollars.

78.     Most manufacturers of gypsum are vertically integrated, meaning they undertake each successive step of production, including production of the primary inputs of Gypsum Board, *e.g.*, gypsum and paper, and the Gypsum Finishing Products, *e.g.*, joint compounds or "drywall mud," setting compounds, tapes, glues and textured products.

79.     Defendants' products are functionally interchangeable. Gypsum Board is produced and sold in standard dimensions. Hence, the Gypsum Board produced by one Defendant does not differ significantly in quality, appearance or use from that produced by another Defendant.

80.     The Gypsum Association describes Gypsum Board as "a family of sheet products consisting of a noncombustible core primarily of gypsum with a paper surfacing or facing." Defendants admit in public filings that Gypsum Board is more like a "commodity," in that price is the principal driver of competition.

D.       **The Gypsum Industry's Market Characteristics Are Conducive to Collusion**

1.       **Sales Of Gypsum Board In The United States Are Conducive To Collusion Because They Are Controlled By Only A Limited Number Of Producers**

81.     Defendants collectively account for over 99% of the Gypsum Board sold in the United States and Canada. The three largest Defendants account for more than 60% of U.S. sales of Gypsum Board. *See Figure 2*.

| Manufacturer | Market Share 2011 |
|---|---|
| USG | 25% |
| National Gypsum | 23% |
| Saint Gobain/BPB/CertainTeed | 13% |
| Georgia-Pacific | 10% |
| American Gypsum | 10% |
| Lafarge | 8% |
| Temple Inland | 7% |
| PABCO | 4% |

*Figure 2.*

82.     The level of concentration set forth above is relatively recent.  In the early 1990's there were several smaller manufacturers with only one or two plants and a regional focus.  Prior to 2002, investor filings discussed the competition that Defendants experienced from "smaller, regional competitors," but Defendants stopped referring to such competitors after 2002.  In fact, in the last fifteen years, the number of Gypsum Board manufacturers has dropped from sixteen to only eight.

83.     This increased concentration of Gypsum Board sales facilitated the conspiracy because a potential cartel would need only to conspire with and police a limited number of companies to be successful.  High market concentration facilitated not only the fixing of prices but also the coordination of pricing terms (including the elimination of job quotes pricing).

### 2.     High Barriers To Entry In The Gypsum Board Market Make The Industry Susceptible To Collusion

84.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants to the market.  Where there are

22

significant barriers to entry, however, new entrants are less likely. With regard to Gypsum Board sales in the United States, high barriers to entry have prevented new entrants into the market despite the artificial inflation of prices and coordinated elimination of job pricing.

85. Entry into the Gypsum Board market involves significant start-up capital expenditures. A new entrant into the business would have to incur tens, if not hundreds, of millions of dollars in costs, including capital expenditures on plants and equipment, regulatory approvals, as well as transportation, electricity, infrastructure for distribution, and labor. The equipment needed to manufacture Gypsum Board is custom-built and would take several years before it could become operational. Moreover, because Gypsum Board manufacturers are vertically integrated, to compete effectively in the market a new entrant would not only have to acquire the means to produce the major inputs into Gypsum Board, such as access to a limited number of gypsum mines, but would also need to acquire the means to refine these inputs into finished Gypsum Board, and to place the product into the marketplace. Further, the major manufacturers already maintain networks of distribution centers which not only make products available, but provide advice about the products as well as information about new product developments to purchasers. This downstream capability is imperative to competing successfully in this industry and would take time as well as capital in order to replicate.

86. As an example of the cost of entering into the market, the purchase of one gypsum line and wallboard plant in Nashville, Arkansas costs $97 million dollars in 1997. And the purchase of Celotex Corporation's gypsum wallboard business cost purchaser BPB P.L.C. $345 million dollars in 2000.

87.     These high barriers to entry helped facilitate Defendants' conspiracy, as they ensured that no new competitors would be able to enter the market to undermine the collusive prices and pricing terms.

**3.      Price Inelasticity For Gypsum Board Makes The Industry Susceptible To Collusion**

88.     When a seller of goods or services can increase prices without suffering substantial reduction in demand, pricing is considered inelastic.  Price inelasticity facilitates collusion because it allows manufacturers to raise their prices collectively without triggering purchaser substitution and lost sales revenue.

89.     Pricing for Gypsum Board is highly inelastic in large part because there are no adequate substitutes.  Gypsum Board is used in virtually all new construction and renovation projects for commercial and residential structures throughout the United States, and because there is no functionally equivalent product Gypsum Board must be purchased for these projects. There are no close substitutes for Gypsum Board that builders can use as a replacement.  This is because Gypsum Board differs from other construction materials in its composition, functional characteristics, customary uses, and low cost.  It is also different from other construction materials such as plaster or lumber because of its ease of application, smooth finish and fire-resistant and moisture-controlling qualities.

90.     Because Gypsum Board has no suitable substitute, manufacturers of gypsum are able to control the market without fear that purchasers might turn to an alternate product.  Even a significant price increase would not cause purchasers to utilize other materials in lieu of Gypsum Board and Defendants saw opportunity to capitalize on this vulnerability.

91.     The price for Gypsum Board is highly inelastic, thus allowing Defendants to collectively raise prices to supra-competitive levels without losing revenue.

### 4.     Defendants Had Many Opportunities To Collude

92.     The Gypsum Board industry provides ample opportunities for Defendants to collude and fix the price of Gypsum Board and Gypsum Finishing Products through trade association meetings.

93.     Every Defendant is a member of the Gypsum Association (the "Association"), and most sit on its Board.  The Gypsum Association board of directors for the 2011-2012 term included: Chairman Leo J. Bissonnette from Defendant Georgia-Pacific, Past Chairman Stephen Raley from Defendant Temple-Inland, First Vice President John K. Donaldson from Defendant CertainTeed, Second Vice President Joseph Holmes from Defendant USG and Treasurer Craig Robertson from Defendant National Gypsum.  The board of directors for the current 2012-2013 term include: Chairman Joseph Holmes from Defendant USG, Past Chairman Leo J. Bissonnette from Defendant Georgia-Pacific, First/ Second Vice Chairman Craig Robertson from Defendant National Gypsum, and Treasurer Ryan Lucchetti from Defendant Pabco.

94.     The Association was founded in 1930 and in addition to publishing a number of promotional, educational, and technical materials concerning the gypsum industry, it hosts quarterly meetings and a yearly conference, at which the Defendants are regular attendees. Numerous employees of the Defendants, including their CEOs and high ranking executives, attended these meetings, which sometimes feature informal dinners for the competitors at the hotels where they are held.  The details and precise dates of these meetings are uncertain.

95.     Defendants also convene annually at the Global Gypsum Conference. Moreover, each Defendant is a member of the Association of the Wall and Ceiling Industry ("AWCI"). Like

the Association, the Global Gypsum Conference and the AWCI provide opportunity and venue for Defendants to collude.

96.     Five Defendants (CertainTeed, Georgia-Pacific, LaFarge, National Gypsum and USG) are also members of the Drywall Finishing Council (DWFC). The Drywall Finishing Council convenes twice a year – first at the annual AWCI Convention which takes place in the Spring, and then again in the Fall.

97.     Notably, in the Fall of 2011, the Association and the DWFC collaborated to draft a new document describing the recommended levels of finish for non-paper-faced panel products. According to Michael Gardner, Executive Director of the Gypsum Association, "gaining input from the DWFC during the early stages of the process will help us work through some of the issues involved.  We fully recognize the need to involve the contracting organizations in the process and we will approach them for input. . . ."  It is evident, by these meetings and "collaborative" endeavors, that Defendants had an opportunity to collude at the beginning of the alleged Class Period.

98.     Trade associations provided an opportunity for Defendants to collude as alleged herein.  These industry meetings and others provided opportunities to meet and confer regarding the price of Gypsum Board, elimination of competitive job quotes, and implementation of the conspiracy described herein.

### 5.     The Gypsum Board Industry Has A History Of Collusive Behavior

99.     Defendants have engaged in similar anticompetitive behavior.  In 2002, the European Union fined four gypsum companies $455 million dollars for engaging in a price-fixing scheme of Gypsum Board and other products between 1992 and 1998.  Two of these

companies – Lafarge and BPB PLC (merged with CertainTeed in the United States) – sell in the United States and are Defendants in this action.

100.     The Gypsum Board industry has run afoul of U.S. antitrust laws many times in the past. In *U.S. Gypsum Co. v. National Gypsum Co.*, 333 U.S. 364 (1948), the Supreme Court reversed the dismissal of a Sherman Act complaint against manufacturers of gypsum wallboard, including defendant US Gypsum, finding that there was sufficient evidence to support a finding that the defendants had violated section 1 and 2 of the Act by engaging in a conspiracy to restrain and monopolize interstate trade in gypsum products. Likewise, in *Wall Products Co. v. National Gypsum Co.*, 326 F. Supp. 295 (N.D. Cal. 1971), US Gypsum and National Gypsum, among others, were found to have violated the Sherman Act by combining and conspiring among themselves to stabilize and maintain the price level of gypsum wallboard.

101.     Similarly, after a nineteen week trial in the 1970's, six gypsum manufacturers, including Defendants US Gypsum, National Gypsum, and Georgia-Pacific, were convicted of criminal antitrust violations in a nationwide conspiracy to fix the price of Gypsum Board. *United States v. Gypsum Co.*, 438 U.S. 422 (1978).  While their convictions were overturned due to faulty jury instructions, on remand from the Supreme Court the Third Circuit denied the manufacturers' motion for a judgment of acquittal, finding there was sufficient evidence from which a jury could have concluded the conspiracy violated the Sherman Act. *United States v. United States Gypsum Co.*, 600 F.2d 414, 419-20 (3d Cir. 1979).

### E.     The Conspiracy

102.     Starting in or before March 2008, Defendants engaged in a conspiracy to raise, fix, maintain and/or stabilize the price of Gypsum Board, eliminate an industry standard pricing practice called job quotes, and restrict supply.  Beginning in at least early 2012, Defendants also

combined and conspired to raise, fix, maintain and/or stabilize the price of Gypsum Finishing Products.

### 1. Defendants' Price Increase On Gypsum Board

#### a. The Early Stages Of The Conspiracy

103.  In early 2008, drywall manufacturers began to announce coordinated price increases despite the housing market decline and stable or declining input costs.

104.  There were further price increase announcements between 2008-2010 that at least certain Defendants made at similar times for similar amounts. Given the state of the construction market in 2008, Defendants would not have attempted to increase prices of Gypsum Board absent a conspiracy to fix prices; s*ee Figure 4 below*.

105.  For example, on August 12, 2008, National Gypsum announced it would be increasing prices for its entire drywall product line nationwide by 10%, effective October 13, 2008. Then, USG announced it would be increasing prices for drywall nationwide by 12%, also effective October 13, 2008.

106.  To be implemented in January 2009, both USG and National Gypsum announced in November identical 15% price increases to take effect nationwide. On November 14, 2008, National Gypsum announced that it would be increasing prices for drywall nationwide by 15%, effective January 5, 2009. On November 26, 2008, USG also announced a 15% price increase on drywall, effective nationwide January 1, 2009.

107.  In early 2010, both USG and National Gypsum announced identical 20% price increases to take effect nationwide on the same day. On February 12, 2010, USG announced a 20% price increase on drywall, effective nationwide on March 15, 2010. On February 15, 2010,

National Gypsum also announced a 20% price increase on drywall, also effective nationwide on March 15, 2010.

108.   In April 2010, there were numerous nearly simultaneous price increase announcements in April 2010 for implementation in May 2010. On April 6, 2010, National Gypsum announced a 20% price increase on drywall, to become effective nationwide on May 10, 2010.

- On April 7, 2010, CertainTeed announced a 20% price increase on drywall, also effective nationwide on May 10, 2010.

- On April 7, 2010, Lafarge announced a 20% price increase on drywall, also effective nationwide on May 10, 2010.

- On April 7, 2010, American Gypsum announced a 20% price increase on drywall, effective nationwide on May 8, 2010.

- On April 9, 2010, USG announced a 20% price increase on drywall, also effective nationwide on May 10, 2010.

109.   Prior to the effective date of these announcements, Defendants met under the auspices of their controlled trade association, the Gypsum Association, at The Woodlands in Texas.  It is widely believed in the industry that Gypsum Board prices are set at these meetings.

110.   A November 3, 2010 memorandum, from Defendant USG led a significant price increase by at least five major drywall producers. Following USG's announcement of a 25% price increase as of December 6, 2010, Defendants CertainTeed, National Gypsum, Lafarge Gypsum and Temple-Inland all released strikingly similar announcements publicizing price spikes of 25%. However, increasing price during a time of decreasing demand was against the unilateral economic interest of each defendant – absent a conspiracy.

### b. Defendants' Coordinated 2012 Price Increase On Gypsum Board

111. Defendants announced a coordinated price increase in the Fall of 2011. The unprecedented increase was the largest the industry had seen in more than a decade. Defendants alerted purchasers of this extreme pricing change via coordinated price increase letters. Essentially carbon copies, these letters advised that the announced price increase would be implemented on either January 1 or January 2, 2012 and would remain in effective for the entirety of the 2012 calendar year. At the same time, Defendants announced they would be ceasing all competitive job quotations effectively immediately.

112. Prior to publication of the Fall 2011 price increase announcement, Defendants met under the auspices of their trade association. Shortly thereafter, Defendants released copycat price increase letters. The price increase percentage, effective date and duration were virtually identical:

- On September 20, 2011, Defendant American Gypsum told purchasers: "Effective January 1, 2012, we will implement a 35% price increase on all gypsum wallboard products. This increased price (up 35%) will be your price for the entire year 2012. This increase applies to all segments of the business."

- On September 30, 2011, Defendant National Gypsum told purchasers that "National Gypsum Company will implement a price increase of 35% on all wallboard products, to be effective on January 1, 2012. It is our intention that the resultant price (up 35%) will apply for all 2012."

- On October 3, 2011, Defendant CertainTeed wrote to inform purchasers that they would receive a new price schedule on November 15 for "all wallboard products." CertainTeed subsequently told purchasers that "our price increase intended to be in effect for the calendar 2012 year, will range between 35% and 37% for all gypsum wallboard products."

- On October 4, 2011, Defendant Lafarge North American Inc. informed purchasers that "on Monday, January 2nd 2012 we will implement a 35% increase on all our wallboard products."

- On October 12, 2011, Defendant PABCO Gypsum told purchasers: "Effective January 1, 2012, PABCO Gypsum will implement a 35% price increase across all product lines. This increase will establish pricing for the calendar year 2012."

Defendant Temple-Inland, Inc. informed Plaintiff of a similar increase at this time. Based upon the investigation of counsel, including interviews with individuals knowledgeable about the industry, Defendants USG, and Georgia-Pacific LLC also communicated to purchasers at or around this time that they would be imposing substantial price increases effective on January 1, 2012, and those increases would remain in place for the 2012 year.

113. One distributor commented on Defendants' synchronized behavior: "As you are probably now aware, all the drywall manufacturers have revised their pricing strategies beginning in 2012. … The manufacturer letters that have been published vary slightly from manufacturer to manufacturer but it amounts to approximately 35% across the gypsum wallboard category."

114. Defendants' steep increase in price of Gypsum Board was not in response to – or in expectation of – an increase in demand for Gypsum Board. To the contrary, Defendants anticipated flat demand, warning investors in 2012 that "demand for drywall would be no better this year than last." National Gypsum stated that wallboard demand "has been essentially flat and at historically low levels," and projected that the "outlook for the next 12 to 18 months might at best be described as a slow 'climb out.'" CertainTeed projected in October 2011 that "[t]he housing market is still anemic with little expectation of real improvement in the coming year." Similarly, in October 2011, USG opined that the market was "going to be flat next year."

115.    Prior to the collusive fall 2011 price increase announcements at issue, Gypsum Board prices had been in a three-month period of decline, falling 0.6% in July 2011, 1.7% in August 2011 and 1.7% in September 2011.

116.    Faced with a weak market and no immediate prospect of rebound, Defendants nevertheless announced a steep increase in the price of Gypsum Board.  This increase was not supported by competitive conditions and, thus, could not have been sustained absent agreement amongst Defendants to raise the price of Gypsum Board.

117.    Nor was the drastic 2012 price increase reflective of elevated costs to produce.  In fact, the costs of major inputs into Gypsum Board were stable or even falling in the 2011-2012 period.  Moreover, because most Defendants are vertically integrated companies they have the ability to control, to a certain extent, the biggest cost inputs of Gypsum Board, *e.g.*, gypsum and paper – as they mine or produce these materials themselves.

118.    Absent collusion, if input costs remain stable or fall and demand is flat, prices would be expected to remain flat or fall as well.  The fact that prices rose substantially and for all Defendants in 2012, despite competitive conditions dictating stable or falling prices, is indicative of collusive behavior.  Here, Defendants were able to increase prices for Gypsum Board even in the face of stable input costs and flat demand without fear that their purchasers could turn to competitors who were selling at a lower price because of the conspiracy, as alleged herein.

119.    Furthermore, these price increases were imposed at a time when there was substantial overcapacity in the industry.  In October 2011, US Gypsum reported that "[c]urrently, there is significant excess wallboard production capacity industry wide in the United States. Industry capacity in the United States was approximately 32.9 billion square feet.  We estimate that the industry capacity utilization rate was approximately 52% during the first nine months of

2010. We project that the industry capacity utilization will remain at approximately that level for the balance of 2011." Industry analysts have recognized the downward pressure this creates on pricing, and have remarked that wallboard prices historically tend to weaken when the industry's rate of capacity utilization has declined below 90%.

120. Without all Defendants concertedly implementing the significant price increase, each Defendant's respective self-interest would have surely dictated price cutting, or at least price moderation, to undercut their rivals' price increase. If only one or a few of the Defendants had increased their prices in the existing soft market, they would have lost sales, customers and market share to the Defendants who did not raise prices. No one Defendant would have had the leverage to increase prices profitably for Gypsum Board to this degree absent collusion.

c. **Defendants' Coordinated 2013 Price Increase On Gypsum Board**

121. Although the market has modestly improved, Defendants continue to impose price increases that are significantly out of proportion to changes in demand. Defendants have recently imposed another round of large price increases. These increases were again implemented on the same date (January 1, 2013), and will again remain in place for the same duration (throughout 2013). For example:

- On August 22, 2012, Defendant American Gypsum told purchasers that it would impose a "25% price increase on all gypsum board products on January 1, 2013 and that price increase would apply to all work performed in 2013."

- On September 6, 2012, Defendant National Gypsum informed purchasers: "Effective with shipments on and after Wednesday, January 2, 2013, National Gypsum Company and its subsidiary entities will increase prices on its entire Gypsum Wallboard product line, including all specialty products, by 30% across the board. It is, once again, our intention that this increase will be good for the entire calendar year of 2013. In addition, our elimination of the practice of providing job quotes remains in effect and is strictly enforced." (Emphasis in original).

33

- On September 13, 2012, Defendant CertainTeed told purchasers that it "will increase price effective with shipments on January 2, 2013 by 30%. This increase amount will apply to all gypsum board products and is intended to be in effect for the entire year." Certain Teed also stated that it was continuing "our policy of not providing job quotes to customers for specific projects."

- On October 15, 2012, Defendant LaFarge told purchasers that effective January 1, 2013, it would increase the price of all wallboard products by 30% and "[t]his price increase applies to all our gypsum board products and it intended to be in effect for all of 2013."

- On October 24, 2012, Defendant PABCO Gypsum informed purchasers: "Effective January 1, 2013, PABCO Gypsum will implement a 30% price increase across all product lines. This increase will establish pricing for the calendar year 2013."

- On November 26, 2012, Defendant Temple-Inland told purchasers that it "will be increasing the price **30%** on all gypsum wallboard products effective with shipments after December 30, 2012." (Emphasis in original).

- On December 3, 2012, Defendant Georgia-Pacific told purchasers it would be "increasing prices . . . effective with shipments on and after **January 1st, 2013**." (Emphasis in original).

- At or about the same time, Defendant USG also informed purchasers of a substantial price increase effective January 1, 2013, that the price increase will remain in effect for the calendar year 2013, and that the elimination of providing job quotes remains in place.

122. Defendants are imposing these additional price increases even though there continues to be substantial overcapacity in the industry. Absent the conspiracy, it would be contrary to the interest of any Defendant to impose such a large increase due to the probability that competing manufacturers with underutilized capacity would seize the opportunity to undercut the increase. As USG again acknowledged in April, "there is significant excess wallboard production capacity industry-wide in the United States. Industry capacity in the United States was approximately 31.9 billion square feet as of January 1, 2012. We estimate that the industry capacity utilization was approximately 54% during the first quarter of 2012

34

compared to 51% during the first quarter of 2011 and 56% during the fourth quarter of 2011. We project that the industry capacity utilization rate will remain at approximately the current level for the balance of 2012." USG recognized that "such a low level of capacity utilization" puts "pressure on gypsum wallboard selling prices and gross margins."

123. Defendants are also maintaining supply restrictions to facilitate the coordinated imposition of yet another round of large price increases. For example, USG, National Gypsum, American Gypsum, Temple-Inland, Lafarge, CertainTeed and Georgia-Pacific communicated and imposed supply restrictions limiting the ability of distributors to purchase larger orders of Gypsum Board in late 2012. USG stated that on or about September 18, 2012, it "put in a controlled distribution policy for our customers" and, as a result, customers "know there's a ceiling on what they can purchase."

124. During the same time period, other Defendants imposed similar supply restraints. Defendants imposed those supply restrictions even though they are substantially underutilizing their capacity. Absent the conspiracy, this would be completely illogical because competing manufacturers could easily gain a significant competitive advantage by providing the Gypsum Board that is being withheld at normal market costs.

### d.     Defendants' Forthcoming 2013 Price Increases On Gypsum Board

125. Defendants have discussed future price increases on Gypsum Board, and have already collectively announced at least two additional price increases in 2013.

126. These intended upcoming price increases have been communicated to certain large purchasers and others within the industry. Defendants have issued two industry-wide price

increase announcements letters (similar to those used in the Fall of 2011 and 2012) to all, or virtually all, purchasers already in 2013.

### e.  Defendants' Coordinated Elimination of Job Quotes

127.   Concurrent with the Fall 2011 price increase announcement, Defendants also informed purchasers that they would cease to provide job quotations.  Job quotes and/or price protection had been a competitive pricing practice in the Gypsum Board industry for more than four decades.  Job quotes allowed purchasers to lock-in a price for Gypsum Board (sometimes with specified price increases) supplied throughout the entire course of a construction project. Defendants' abrupt elimination of job quotes signified a fundamental change in competitive price for the Gypsum Board industry.

128.   Until 2011, it was a standard competitive practice in the industry to allow purchasers of Gypsum Board to negotiate job quotes with the Defendants. Prior to implementation of Defendants' conspiracy, as much as 70% of all Gypsum Board was sold pursuant to a job quote. One distributor described this price protection practice as "ingrained" in the industry.

129.   The agreement to eliminate this form of price competition facilitated Defendants' tracking and monitoring of cartel members' prices, and thus the enforcement of the conspiracy. The use of job quotes made competitor pricing in the industry somewhat more difficult to observe.  With job quote pricing in place, it would be harder for one cartel member to determine whether a low price given to a particular purchaser by another cartel member was pursuant to a job quote guarantee or was instead a deviation from the cartel price. Without job quotes, Defendants would be much better able to monitor and discipline other cartel members in furtherance of their overall price-fixing conspiracy.  By collectively eliminating this form of

price competition, the Defendants ensured that each of them could much more easily, accurately and comprehensively learn each other's prices. Thus, the elimination of job quotes both facilitated the coordinated price increases and the policing of the conspiracy.

130. The primary purpose of Defendants' agreement to eliminate job quotes was to shift the risk of future price increases to purchasers and increase the price of Gypsum Board across the country. Recent reports confirmed that the elimination of job quotes, coupled with the announcement of a single higher price that remained in place for the entire year, resulted in a sharp rise in wallboard prices in 2012. The concerted elimination of job quotes not only resulted in higher prices of Gypsum Board but also did away with any competition between Defendants.

131. The letters alerting purchasers about the discontinuation of job quotes closely mirrored one another:

- "Our past job quote policy is no longer appropriate as we seek to improve the consistency and administrative efficiency of our pricing policies. In light of the changing market, USG will no longer offer job quotes and/or price protection on wallboard, effective immediately." (USG letter, September 28, 2011)

- "The practice of providing job quotes is broken and counterproductive to meaningful and consistent price management needed to support profitability. Therefore, effective immediately, we will discontinue for all product lines the policy of providing job quotes." (National Gypsum letter, September 30, 2011).

- "Effective immediately, we will no longer be providing job quotes." (American Gypsum Letter, September 30, 2011).

- "In review of our business practices and policies for bringing products to market, we have noted a significant increase in the amount of job quote requests and find the process to be inefficient and administratively burdensome. Accordingly we find it necessary to cease all job quotes immediately." (CertainTeed letter, October 3, 2011).

- "… [E]ffective immediately, we will cease all job quotations." (LaFarge Gypsum Letter, October 4, 2011).

37

- "Effective immediately, PABCO Gypsum will discontinue the policy of providing job quotes." (PABCO Gypsum Letter, October 12, 2011).

132.     It would have been against the self-interest of any one Defendant to eliminate the job quote pricing practice unilaterally.  Absent collusion, any Defendant who was unwilling to offer this competitive pricing term would have lost sales and market share to competitors who continued to offer this price protection to purchasers.  No one Defendant would have had the leverage to eliminate this form of competition alone; only by conspiring could Defendants have effectively eliminated this "ingrained" industry practice.

133.     Since Defendants announced the discontinuation of all job quotes in the fall of 2011, each of the Defendants has continued to make this price protection unavailable to purchasers.  For example, on September 6, 2012, National Gypsum told purchasers that "our elimination of the practice of providing job quotes remains in effect and is strictly enforced." On September 13, 2012, CertainTeed told purchasers that it "continues our policy of not providing price quotes to purchasers for specific projects."  The other Defendants have, in like manner, adhered to the cessation of job quotes imposed by all of the conspirators in late 2011.

### f.      Defendants' Concerted Supply Restrictions

134.     In conjunction with the price increases described herein, Defendants have also imposed restrictions on the supply of Gypsum Board made available to distributors. For example, distributors and/or purchasers were informed by USG, National Gypsum, American Gypsum, Pabco, CertainTeed and Georgia Pacific in or about September 2011, that they were not permitted to purchase supplies of Gypsum Board that exceeded earlier purchases during the year.  These supply restrictions facilitated the Defendants' ability to impose and maintain the price increases described herein.

135. To help enforce supply restrictions, Defendants notified and/or monitored distributors to ensure that they did not build up surplus inventory to circumvent the price increase. For example, "to address the likelihood of increased product demand prior to the new price, CertainTeed reserve[ed] the right to regulate shipments prior to the increase." (CertainTeed Letter, October 26, 2012). Pursuant to the conspiracy, Defendants also alerted co-conspirators when a particular distributor appeared to be accumulating excess supply.

136. These supply restrictions have been imposed despite the substantial overcapacity in the Gypsum Board industry. As set forth above, and as acknowledged by USG in 2012, the industry's capacity utilization is still at "historically low" levels. Craig Weisbruch, National Gypsum's senior vice president of sales and marketing, conceded that manufacturers expect to sell about 17bn ft$^2$ of wallboard in 2011, down from 38bn ft$^2$ in 2006.

137. Because of this underutilized capacity, it would have been contrary to the independent interests of any individual Defendant to restrict the supply of Gypsum Board made available to its purchasers. If an individual manufacturer withheld supply from a purchaser, the purchaser could – in an unrestrained marketplace – approach competing manufacturers with unused capacity. Thus, a manufacturer restricting supply to a purchaser unilaterally would risk not only loss of that specific business, but could also jeopardize the customer relationship by encouraging the purchaser to do business with a competitor. The conspiracy, however, has allowed each Defendant to impose large price increases and supply restraints without fear of losing business to its co-conspirators.

### 2. Defendants' Conspiratorial Price Increase On Gypsum Finishing Products

#### a. <u>Defendants' Coordinated 2012 Increase On Gypsum Finishing Products</u>

138. Not only did Defendants engage in a conspiracy to fix and raise the price of Gypsum Board, they also combined and conspired to fix and raise the price at which they sold Gypsum Finishing Products.

139. Seeing the success of their earlier 2012 price increase on Gypsum Board, Defendants once again saw opportunity to set supra-competitive prices on Gypsum Board's sister products. Because Gypsum Finishing Products are necessary for the installation of drywall, Defendants knew purchasers would have no choice but to succumb to the price increase.

140. To announce their collusive price increase, Defendants again issued letters that were remarkably similar. For example:

- On February 17, 2012, Defendant USG informed purchasers: "Effective with shipments on and after Monday, March 19, 2012, USG will increase pricing 7% on all interior finishing products . . . Your new price will be in effect for the remainder of 2012."

- On February 27, 2012, Defendant National Gypsum informed purchasers: "Effective with shipments on and after **Monday, April 2, 2012**, National Gypsum Company and its subsidiary entities will increase prices on . . . Interior Finishing Products (complete product line) 7%." (Emphasis in original).

141. These price increases were unprecedented, as prices for these finishing products had remained flat or declined for several years prior to the price increase.

142. The primary input of the finishing materials is resin. Prices for resin rose only 3% during this time period, meaning the price increase alleged herein was not supported by any sizable increase in input costs.

143. Nor can economic conditions related to demand explain the alleged increase. Demand for Gypsum Finishing Products is primarily driven by the home building market and remodeling industry. Demand in this industry did not increase substantially enough in 2011 and 2012 to explain the coordinated price increase alleged herein.

144. With the Gypsum Board conspiracy already in motion, Defendants executed the coordinated price increase on Gypsum Finishing Products with ease.

### b. **Defendants' Coordinated 2013 Increase On Gypsum Finishing Products**

145. Likewise, Defendants announced another round of price increases on Gypsum Finishing Products for 2013. Defendants' price increase letters were again substantially similar in percentage, effective date, and duration:

- On October 26, 2012, Defendant CertainTeed informed purchasers that "CertainTeed is announcing a price increase on all insulation products . . ."

- On December 14, 2012, Defendant USG wrote: "In March of 2012, USG increased prices on all interior finish products and advised you price would hold for all of 2012 . . . Effective on February 1, 2013 all joint finishing and accessory products (including plasters, beads and trims) will increase 5%. All sealants will increase 15%." USG further indicated that "the new price list will be good for all of 2013."

- On December 19, 2012, Defendant National Gypsum informed purchasers: "Effective with shipments on and after **Monday, February 4, 2013**, National Gypsum Company and its subsidiary entities will increase prices . . . 7% - Interior Finishing Products (complete product line)." (Emphasis in original).

- On January 11, 2013, Defendant LaFarge told purchasers that it "will be increasing prices for our Rapid Coat Join compound effective with orders shipping on and after **Monday, February 11th, 2013**.

146. Together, Defendants once again capitalized on the vulnerability of purchasers, making it impossible for purchasers of Gypsum Board to properly install drywall without paying artificially inflated prices for the Gypsum Finishing Products.

### c. **Defendants' Forthcoming 2013 Price Increases On Gypsum Finishing Products**

147.     As is the case with Gypsum Board, Defendants have already reportedly discussed plans for at least two more 2013 price increases on Gypsum Finishing Products. There are no economic justifications for these impeding increases.

## F.     **Industry Patterns Support The Existence Of A Conspiracy**

### 1.     **A Comparative Analysis Of Crude Gypsum Prices To Defendant Pricing Patterns And Decreased Demand For Gypsum Board Evidences Conspiratorial Conduct**

148.     An analysis of publicly available supply and demand data and pricing information supports existence of a conspiracy in the Gypsum Board industry. Based upon analysis of publicly available data, the prices of Gypsum Board have, since at least 2008, exceeded prices that would be expected in a competitive marketplace. These higher prices have been exceptionally pronounced since 2011, when Defendants announced a historically high price increase of 35% on Gypsum Board and 15% on Gypsum Finishing Products in the face of a general decrease in crude gypsum prices and resin, and to maintain those prices during a continued decreased in demand brought on by the collapse of the residential and commercial construction in 2008.

149.     The primary input of Gypsum Board is crude gypsum. Price fluctuations in the unit value of 1 metric ton of crude gypsum do not support the substantial price increases imposed by Defendants on purchasers of Gypsum Board.

150.     According to the U.S. Geological Survey Minerals Yearbook, the price per metric ton of crude gypsum *decreased* 1.74% from 2008 to 2009. However, Defendants announced a 12% increase to the price of Gypsum Board during that same time period.

151.    From 2009 to 2010, crude gypsum prices actually *decreased* 13.6%, and Defendants again announced a 15% increase in the price of Gypsum Board.

152.    From 2010 to 2011, Gypsum prices only increased 0.69%. Nevertheless, Defendants announced price increases of 20%.

153.    In Fall 2011, Defendants announced a 35% price increase when crude gypsum prices experienced no change.

154.    Finally, in Fall 2012, and into 2013, Defendants have yet again announced a 35% price increase for Gypsum Board, with the expectation that crude gypsum prices will remain the same or decrease.  *See Figure 3.*



*Figure 3.*

155.    *Figure 3* illustrates that the cost of crude gypsum (the primary input of Gypsum Board) does not justify the need for such significant price increases on Gypsum Board imposed by Defendants. *See Figure 3.*

156.    The increases described in the above paragraphs could potentially be explained by increased demand. This explanation, however, is not plausible because the demand for Gypsum

Board, which depends principally on the strength of the construction industry, declined during this period.

157.    By August 2008, as the real estate market plummeted, so too did construction spending and housing starts. The demand for Gypsum Board principally follows the ebb and flow of the construction market. Contrary to this well-established supply and demand relationship, the price of Gypsum Board did not decline consistent with the drop in housing starts and continued descent of the construction market. *See Figure 4.*



*Figure 4.*

158.    Although the percentage of housing starts has never recovered to the pre-conspiracy levels, the price of Gypsum Board increased approximately 60% during the same time period. Given the fact that input costs remained stable, this is significant evidence of a conspiracy.

159.    Despite low demand, Defendants collectively announced price increases on Gypsum Board as a means to stem their mounting losses, and Defendants fully realized the

success of their efforts when they eliminated the practice of providing job quotes alongside the 2012, price increase on Gypsum Board.

### 2. Price Increases Closely Followed Industry Meetings

160.    Since 2008, Global Gypsum, the AWCI, and the DWFC have held meetings on at least the following dates:

| Trade Association | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 (Upcoming) |
|---|---|---|---|---|---|---|
| Global Gypsum | May 12-13 *Dubai, United Arab Emirates* | May 11-12 *Rio de Janeiro, Brazil* | Oct. 25-26 *Paris, France* | Oct. 17-18 *Las Vegas, US* | Oct. 16-17 *Istanbul, Turkey* | Oct. 21-22 *Toronto, Canada* |
| Association of the Wall and Ceiling Industry (AWCI) | March 24-27 *Las Vegas, NV* | March 24-28 *Nashville, TN* | April 19-24 *Denver, CO* | April 3-7 *Las Vegas, NV* | April 15-19 *Charlotte, NC* | March 18-22 *San Antonio, TX* |
| Drywall Finishing Council (DWFC) | March 25 *Las Vegas, NV (during AWCI)* September 23 *Las Vegas, NV* | March 26 *Nashville, TN (during AWCI)* October 6 *Las Vegas, NV* | April 22 *Denver, Co (during AWCI)* | April 5 *Las Vegas, NV (during AWCI)* Sept. 19-20 *Las Vegas, NV* | April 17 *Charlotte, NC (during AWCI)* | March 18-19 *San Antonio, TX (during AWCI)* |

*Figure 5.*

161.    Significant price increases on Gypsum Board often closely followed these industry meetings.

162.    For example, Defendants met at the AWCI Annual Convention on March 24-27, 2008 in Las Vegas, NV and a price increase became effective April 1, 2008. The proximity to which the price increase announcement letters were sent after Defendants met at the AWCI Annual Convention would seem to indicate that a pricing agreement was reached at that industry meeting. Similarly, Defendant USG announced a 25% price increase on November 3, 2010, which was just after the Oct. 25-26 Global Gypsum Conference in Paris, France. As Courts have recognized, this suggests that conspiratorial conversations regarding prices took place at these meetings.

### 3.    Defendants' Stated Reasons For Price Increases Were False

163.    Defendants often provided reasons for price increases that were demonstrably false.

164.    For example, throughout the period 2008-2010, Defendants generally justified price increases of Gypsum Board by referring to increases in raw material prices. While in some cases there were increases in the price of raw gypsum, in other cases there were no such increases or the increases in the price of raw gypsum were not sufficient to justify the increase in Gypsum Board prices. *See Figure 3 above.*

165.    Moreover, even where there were increases in input prices, these increases were more than offset by decrease in Gypsum Board demand, which should have led to a *decrease*, rather than an increase, in prices.

## VIOLATIONS OF THE ANTITRUST LAWS

166.    Beginning by at least September 2011 and continuing through the present, Defendants have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of Gypsum Board and Gypsum Finishing Products in the United States.

167.    Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of Gypsum Board and Gypsum Finishing Products sold in the United States.  These activities included:

(a)    participation in meetings, conversations, and communications to discuss the price and pricing terms for the sale of Gypsum Board and Gypsum Finishing Products in the United States;

(b)    agreement during those meetings, conversations, and communications to charge prices at specified levels and otherwise to fix, raise, maintain, or stabilize prices of Gypsum Board and Gypsum Finishing Products sold in the United States; and

(c)    agreement during those meetings, conversations, and communications to discontinue the industry practice of providing job quotes, in furtherance of their conspiracy to fix, raise, maintain, or stabilize the prices of Gypsum Board and Gypsum Finishing Products sold in the United States.

(d)    taking numerous steps, as set forth above, to implement and maintain the conspiracy.

168.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

169.    Throughout the Class Period, Plaintiff and the other Class members purchased Gypsum Board and Gypsum Finishing Products from Defendants (or their subsidiaries or controlled affiliates) at supra-competitive prices.

170.    Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## ANTI-COMPETITIVE EFFECTS

171.    As a result of Defendants' unlawful conduct, Plaintiff and the other Class members have been injured in their business and property because they have paid more for Gypsum Board and Gypsum Finishing Products than they would have paid absent collusion.

172.     Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

(a)     price competition in the markets for Gypsum Board and Gypsum Finishing Products has been artificially restrained;

(b)     prices for Gypsum Board and Gypsum Finishing Products sold by Defendants have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

(c)     purchasers of Gypsum Board and Gypsum Finishing Products from Defendants have been deprived of the benefit of free and open competition in the markets for Gypsum Board.

**CAUSE OF ACTION – VIOLATIONS OF SHERMAN ACT § 1**

173.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

174.     Beginning in at least September 2011, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

175.     Defendants entered into an agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Gypsum Board and Gypsum Finishing Products in the United States.

176.     Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to eliminate job quotes in furtherance of their conspiracy to fix, raise, maintain, or stabilize the price of Gypsum Board and Gypsum Finishing Products.

177.     Plaintiff and the other Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.

Plaintiff and Class members have paid more for Gypsum Board and Gypsum Finishing Products than they otherwise would have paid in the absence of Defendants' conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

178. Accordingly, Plaintiff and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

179. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

180. Wherefore, Plaintiff demands judgment against Defendants as follows:

    a. Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined therein;

    b. That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

    c. That judgment be entered for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law.

    d. That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law.

    e. That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law.

    f. For such other and further relief as is just and proper under the circumstances.

Date: March 4, 2013                    Respectfully submitted,


                                       /s/ Anthony J. O'Neill_____
                                       Charles E. Tompkins
                                       Anthony J. O'Neill
                                       Bethany C. Teska
                                       WILLIAMS MONTGOMERY & JOHN, LTD.
                                       233 South Wacker Drive
                                       Suite 6100
                                       Chicago, IL   60606
                                       Tel: 312-443-3200
                                       Fax: 312-630-8500
                                       cet@willmont.com
                                       ajo@willmont.com
                                       bct@willmont.com

DOC ID# 1101342